## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| KURATLE CONTRACTING, INC., | ) | |
| a Delaware Corporation | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N12C-03-079 MJB |
| | ) | |
| LINDEN GREEN CONDOMINIUM, | ) | |
| ASSOCIATION, a Delaware | ) | |
| Corporation | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: July 3, 2014
Decided: October 22, 2014

*Upon Plaintiff's Motion for Reimbursement of Attorney's Fees and Costs,*

**GRANTED in part and DENIED in part**.

## <u>OPINION</u>

Thomas C. Marconi, Esq., Losco & Marconi, P.A., *Attorney for Plaintiff*

Michael F. Duggan, Esq., and Marc Sposato, Esq., Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., *Attorneys for Defendant*

**BRADY, J.**

# I. INTRODUCTION

The underlying cause of action in this case concerns a contract dispute between Kuratle Corporation, Inc. ("Plaintiff") and Linden Green Condominium Association ("Defendant"). Plaintiff is a Delaware corporation that is engaged in the business of management and maintenance of condominium complexes. Plaintiff is owned and operated by Henry and DruAnne Kuratle (individually, "Mr. Kuratle" and "Mrs. Kuratle"). Defendant is a non-profit Delaware corporation that manages the business and affairs of the Linden Green condominium complex in New Castle County, Delaware.

In 2002, 2007, and 2010, Plaintiff and Defendant entered into a series of contracts under which Plaintiff was to provide management and maintenance for Defendant. In 2011, a dispute arose over the validity of the 2010 Agreement. In 2012, Plaintiff commenced the instant action, asserting that Defendant had breached the 2007 and 2010 agreements. Defendant responded and counterclaimed alleging various kinds of managerial misconduct by Plaintiff. Defendant voluntarily dismissed its counterclaims before trial. Before trial, the Court determined as a matter of law that Defendant breached a valid contract. Trial was held in December 2013 solely to determine the extent to which Plaintiff sustained damages as a result of Defendant's breach. The jury found for Plaintiff in the amount of $165,000.

After trial, Plaintiff filed a Motion for Additur or New Trial, which was subsequently denied by the Court. Plaintiff also filed the instant Motion for Costs and Fees. Defendant responded in opposition to Plaintiff's Motion. On March 18, 2014, the Court requested simultaneous supplemental briefing on the issue of whether Defendant's counterclaims were made in bad faith. The supplemental briefing was submitted by both Plaintiff and Defendant, and the Court took the matter under consideration on July 3, 2014.

For the reasons set forth below, Plaintiffs Motion for Cost and Fees is **GRANTED** in part and **DENIED** in part.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. The 2002, 2007, and 2010 Agreements

The parties entered into three agreements, in 2002, 2007, and 2010, respectively. The three agreements all contained nearly identical terms. For each agreement, in addition to the main contract signed by the parties, there were additional documents specifically addressing proposed work by Plaintiff for "Landscaping and Maintenance," "Snow Removal," and "Property Management." These additional documents were not signed by the parties, but neither party has disputed that the additional documents were part of the agreements.

In November 2002, the parties executed the first written agreement ("2002 Agreement"), under which Defendant employed Plaintiff "to manage the maintenance, operations, landscaping, snow removal, and finances of [Defendant]."[1] The 2002 Agreement covered the roughly five-year period from December 1, 2002 to December 31, 2007.

In October 2007, prior to the expiration of the 2002 Agreement, the parties executed the second written agreement ("2007 Agreement"), which contained nearly identical terms.[2] The 2007 Agreement was supposed to cover the next five-year period, from January 1, 2008 to December 31, 2012.

---

[1] Complaint, Ex. A, "2002 Agreement".
[2] Complaint, Ex. B, "2007 Agreement".

2

In September 2010, the parties executed the third written agreement ("2010 Agreement"), again containing nearly identical terms except for updated pricing.[3] The 2010 Agreement replaced and superseded the 2007 Agreement.[4] The commencement date printed on the agreement was January 1, 2010, and its expiration date was December 31, 2017.[5] Plaintiff argued that the parties hence intended the 2010 Agreement to apply retroactively. However, Defendant argued that the 2010 Agreement was not intended to apply retroactively and offered the deposition testimony of Olive Shepherd, who was Secretary of the Linden Green condominium association at the time, in support of Defendant's view.[6] Prior to trial, upon the parties' cross-motions for partial summary judgment, the Court found that the question of whether the 2010 Agreement was intended by the parties to apply retroactively from January 1, 2010 could not be determined as a matter of law, but that the retroactivity question did not affect the agreement's validity.[7]

**B. The Parties Exchange Letters**

On December 12, 2011, over a year after the 2010 Agreement was executed, Defendant sent a letter to Plaintiff advising that Defendant had submitted the 2010 Agreement to an attorney who advised that the 2010 Agreement was "invalid and unenforceable."[8] Defendant's letter further advised that Defendant would expect Plaintiff to continue to operate under the 2007 Agreement, but added that the attorney had found "some problems" with the 2007 Agreement.[9] Defendant proposed an "Addendum," which provided for a consultant to oversee various aspects

---

[3] Complaint, Ex. C, "2010 Agreement".
[4] Complaint, Ex. C, "2010 Agreement".
[5] Complaint, Ex. C, "2010 Agreement".
[6] Plaintiff's Motion for Partial Summary Judgment (Sept. 17, 2013), Tab 3 at 16.
[7] Opinion (Nov.19, 2013) at 20-21.
[8] Complaint, Ex. E, "2011 Letter: Linden Green to Kuratle".
[9] Complaint, Ex. E, "2011 Letter: Linden Green to Kuratle".

of Plaintiff's performance.[10] Defendant requested that Plaintiff "sign the Addendum and keep a copy for [Plaintiff's] records."[11] The Addendum itself stated that Plaintiff's failure to sign the Addendum would be considered a default, which could result in the termination of the 2007 Agreement.[12]

On December 29, 2011, Thomas B. Ferry, Esq. ("Ferry"), who was then counsel for Plaintiff, wrote to Defendant in response.[13] In the letter to Defendant, Ferry stated that he had reviewed to 2010 Agreement and concluded that it was valid and enforceable.[14] Ferry's letter also stated that the Addendum was not acceptable to Plaintiff and that Plaintiff would not sign the Addendum.[15] Finally, Ferry's letter stated that Plaintiff intended to comply with the original 2010 Agreement (without the Addendum) and expected Defendant to do likewise.[16]

Thereafter, in a letter dated January 16, 2012, Defendant declared Plaintiff to be in default of the 2007 Agreement for failing to execute the addendum.[17] The letter stated that because of the default, Defendant was hereby terminating its 2007 contract with Plaintiff.[18]

### C. The Instant Action

Plaintiff filed suit on March 7, 2012, asserting two alternative theories under which Defendant had breached the contract between the parties. First, Plaintiff contended that the 2010 Agreement was valid and enforceable, and that Defendant had breached the 2010 Agreement by

---

[10] Complaint, Ex. E, "Linden Green's Addendum".
[11] Complaint, Ex. E, "2011 Letter: Linden Green to Kuratle".
[12] Complaint, Ex. E, "Linden Green's Addendum".
[13] Complaint, Ex. F, "Ferry's Letter".
[14] Complaint, Ex. F, "Ferry's Letter".
[15] Complaint, Ex. F, "Ferry's Letter".
[16] Complaint, Ex. F, "Ferry's Letter".
[17] Complaint, Ex. H, "2012 Letter: Linden Green to Kuratle".
[18] Complaint, Ex. H, "2012 Letter: Linden Green to Kuratle".

trying to impose the Addendum,[19] wrongfully locking Plaintiff out of the Condominium Association's office, failing to pay invoices for specific maintenance services, and prematurely terminating the parties' business relationship.[20] Second, Plaintiff alleged that even if the Court were to find the 2010 Agreement invalid, Defendant breached the 2007 Agreement by terminating the parties' business relationship prematurely.[21] Plaintiff contended that Defendant had no right to terminate the 2007 Agreement on the basis of Plaintiff's refusal to sign the addendum.[22]

On April 13, 2012, Defendant filed an Answer, Affirmative Defenses, and a Counterclaim.[23] Defendant's Counterclaim and Affirmative Defenses stated that Plaintiff had acted tortuously and breached the contract by mismanaging the Linden Green complex and failing to perform under the 2002 and 2007 Agreements in various ways.[24]

### D. Pre-Trial Motions

Plaintiff filed a Motion for Partial Summary Judgment on September 17, 2013, contending that the undisputed facts support a finding that Defendant breached a valid, enforceable contract—namely, the 2010 Agreement.[25] On October 15, 2013, Defendant filed a Motion for Partial Summary Judgment, asserting that (a) the 2010 Agreement was unenforceable because the provision stating the contract's term was indefinite, and (b) even if the 2010

---

[19] More specifically, Plaintiff alleged that Defendant breached by trying to impose the Addendum, which was stated to be an addendum to the 2007 Agreement; when (a) the terms of the 2007 Agreement had already been superseded by the 2010 Agreement, and (b) the terms of the Addendum were independently unacceptable to Plaintiff. Complaint at 6.

[20] Complaint at 6.

[21] Complaint at 7.

[22] Complaint at 7.

[23] Answer, Affirmative Defenses, and Counterclaim ("Answer").

[24] Answer at 4-5.

[25] Brief in Support of Plaintiff's Motion for Partial Summary Judgment (Sept. 17, 2013).

Agreement was enforceable, it was properly terminated by Defendant.[26] Finally, also on October 15, 2013, Plaintiff filed a second Motion for Partial Summary Judgment, arguing that Defendant was barred from pursuing a counterclaim for any conduct that occurred prior to April 13, 2009, citing a three-year statute of limitations.[27]

On November 19, 2013, the Court granted both of Plaintiff's Motions for Partial Summary Judgment and denied Defendant's Motion for Partial Summary Judgment. Concerning Plaintiff's Motions, the Court concluded that (1) the 2010 Agreement was valid and enforceable, and Defendant breached the 2010 Agreement when it ultimately terminated the parties' business relationship, and (2) the three-year statute of limitations, under 10 *Del. C.* §8106, barred Defendant from asserting any claims after April 13, 2009. The Court found that Defendant failed to satisfy its burden of pleading adequate facts to support an application of the time-of-discovery rule, which would have allowed Defendant to assert tort claims after April 13, 2009.[28]

Concerning Defendant's Motion, the Court found that (1) the 2010 Agreement was valid and enforceable despite the dispute over its effective date, and (2) Defendant breached the 2010 Agreement when it terminated the parties' business relationship based on Plaintiff's refusal to execute the Addendum.[29]

### E. Trial

Because the Court determined as a matter of law that Defendant breached a valid contract, the sole issue at trial was the extent to which Plaintiff sustained damages as a result of Defendant's breach. Trial commenced on December 2, 2013 and concluded on December 4,

---

[26] Defendant's Motion for Partial Summary Judgment (Oct. 15, 2013).
[27] Plaintiff's Motion for Partial Summary Judgment (Oct. 15, 2013).
[28] Opinion (Nov. 19, 2013) at 29.
[29] Opinion (Nov. 19, 2013) at 27.

2013. At the close of Plaintiff's case in chief, Defendant moved for and was granted judgment as a matter of law that Plaintiff was not entitled to punitive damages. The jury returned a verdict for Plaintiff in the amount of $165,000. After trial, on December 12, 2013, Plaintiff filed a Motion for Additur or New Trial, which was denied by the Court on March 27, 2014.

### III. PLAINTIFF'S MOTION FOR COSTS AND FEES

### A. Plaintiff's Motion and Defendant's Response in Opposition

Plaintiff filed the instant Motion for Costs and Attorney's Fees on December 17, 2013. Plaintiff argues that Plaintiff is entitled to costs and fees under both the fee-shifting contractual provision exception and the bad faith exception to the American Rule that parties are responsible for bearing their own litigation costs.[30] Plaintiff argues that the 2010 Agreement, which the Court found valid, contains a fee-shifting provision on the second page of the document entitled "Landscaping and Maintenance Proposal."

In the alternative, Plaintiff argues that costs and fees should be taxed against Defendant for asserting claims in bad faith, including claims against Plaintiff for fraud, theft, gross willful and wanton negligence, intentional concealment, self-dealing, and improperly removing over $100,000 from Defendant's bank accounts.[31] Plaintiff alleges that Defendant knew these claims were baseless, but chose to assert them as a litigation strategy. Plaintiff relies on the trial testimony of Charles Hamrick ("Hamrick"), who was president of the condominium association from September 2011 to September 2013 and who is representing Defendant in the instant litigation. Plaintiff's interpretation of Hamrick's testimony is that Defendant made these allegations because it had been sued by Plaintiff and felt that it needed to assert a strong

---

[30] Plaintiff's Motion for Costs and Fees at 3.
[31] Plaintiff's Motion for Costs and Fees at 5.

7

defense.[32]  Plaintiff suggests that Defendant asserted these claims "in an effort to make good on a threat by [Defendant] to make Plaintiff's 'business practices… a matter of public record' if Plaintiff refused to abide by [Defendant's] demand to disavow the 2010 agreement, and agree to the proposed Amendment to the 2007 Agreement."[33]

Defendant submitted a Response in Opposition to Plaintiff's Motion for Costs and Fees on January 2, 2014.  Defendant disputes Plaintiff's characterization of the provision within the "Landscaping and Maintenance Proposal" document as a general fee-shifting provision.[34]  Defendant alleges that when this provision is read in context, it is clear that it applies only to reimbursement for costs incurred in using a collection agency or an attorney to collect delinquent invoices for certain additional lawn care services.[35]  In contrast, says Defendant, the contract's general indemnification provision (at §E of the main document, which is signed by both parties) does not include a provision for fee-shifting.[36]

Defendant argues that the bad faith exception also does not apply.  Defendant argues that it voluntarily dismissed its counterclaim, not because the claim was frivolous or intended to be vexatious, but "because the cost of proceeding with the claim was not justified by the amount of recovery available from [Plaintiff]," as Defendant allegedly discovered that "[Plaintiff] had little to no recoverable assets to satisfy a judgment."[37]  Defendant argues that Plaintiff has mischaracterized the testimony of Hamrick, and that Hamrick's answers concerning the validity of the counterclaims were based on his limited personal knowledge rather than what Defendant

---

[32] Plaintiff's Motion for Costs and Fees at 5-6.
[33] Plaintiff's Motion for Costs and Fees at 6.
[34] Defendant's Response in Opposition (Jan. 2, 2014) at 2.
[35] Defendant's Response in Opposition (Jan. 2, 2014) at 2.
[36] Defendant's Response in Opposition (Jan. 2, 2014) at 4.
[37] Defendant's Response in Opposition (Jan. 2, 2014) at 6.

knew.[38]  Defendant maintains that Defendant itself did have adequate basis for believing that Plaintiff had mismanaged the condominium complex.  Defendant cites a report issued by a forensic accountant (the "Horty Report"), which Defendant says "outlines very clearly the deficiencies in [Plaintiff's] management of the books and records," including seven months of missing bank statements from a bank account belonging to Defendant and under Plaintiff's control, bank statements showing disbursements totaling $197,802.85 with no transactional support, and thirty-five disbursements to Plaintiff from a bank account belonging to Defendant without supporting invoices.[39]  Defendant concludes that this evidence shows that Defendant had at least a good faith basis for its allegations that Plaintiff engaged in fraud and mismanagement.

### B. Supplemental Briefing at the Direction of the Court

On March 18, 2014, the Court requested simultaneous supplemental briefing specifically on the bad faith argument.  The Court requested that the parties cite with specificity to the record to support their respective positions.  Plaintiff and Defendant both submitted supplemental memoranda on July 3, 2014.

In its supplemental memorandum, Plaintiff states first that Plaintiff is not seeking reimbursement under the bad faith theory for costs incurred in litigating the main claim.[40]  Plaintiff says that it is only seeking costs and fees expended in opposing Defendant's affirmative defenses and counterclaim.[41]  Plaintiff alleges that Defendant dragged its heels in discovery, before finally producing the Horty Report.  Plaintiff alleges that "[Defendant's] response to nearly every interrogatory and request for production seeking specific facts, witnesses, and

---

[38] Defendant's Response in Opposition (Jan. 2, 2014) at 7-8.
[39] Defendant's Response in Opposition (Jan. 2, 2014) at 8.
[40] Plaintiff's Supplemental Briefing (July 7, 2014) at 1-2.
[41] Plaintiff's Supplemental Briefing (July 7, 2014) at 2.

9

documents supporting the affirmative defenses and counterclaim, was that it could produce nothing to support these allegations, but that an audit of [Defendant's] books and records going back to 2002 was being performed… and this audit would uncover the evidence justifying the allegations."[42] After a lengthy back-and-forth between the parties, which included the Court granting Plaintiff's Motion to Compel and for Sanctions, Defendant finally served the Horty Report on May 16, 2013. However, while the report stated that there were "practices" that the expert found to be "deficient," Plaintiff contends that there was no specific evidence to support any of Defendant's allegations.[43]

Defendant voluntarily dismissed its counterclaim six business days before trial. While Defendant contends that it did so because it believed that Plaintiff had no funds to pay any judgment, Plaintiff argues that this was not the real reason.[44] According to Plaintiff, Defendant knew that Plaintiff's expert had opined that the net present value of Plaintiff's compensatory damages claim was $518,000.[45] In light of this estimate, Plaintiff contends that it would have been reasonable for Defendant to pursue any valid counterclaims in hopes of offsetting any damage award to Plaintiff.[46]

Plaintiff contends that even though the counterclaim had been dismissed prior to trial, the issues of the affirmative defenses and the counterclaim were raised at trial.[47] Plaintiff specifically cites the testimony of Hamrick, who Plaintiff characterizes as having been in charge of the instant litigation since he was acting as Defendant's representative.[48] According to

---

[42] Plaintiff's Supplemental Briefing (July 7, 2014) at 3-4.
[43] Plaintiff's Supplemental Briefing (July 7, 2014) at 6.
[44] Plaintiff's Supplemental Briefing (July 7, 2014) at 6.
[45] Plaintiff's Supplemental Briefing (July 7, 2014) at 6.
[46] Plaintiff's Supplemental Briefing (July 7, 2014) at 6.
[47] Plaintiff's Supplemental Briefing (July 7, 2014) at 6.
[48] Plaintiff's Supplemental Briefing (July 7, 2014) at 6.

Plaintiff, Hamrick "was unable to state any facts which supported the allegations of fraud, theft, gross, willful, and wanton negligence, intentional concealment, comingling of funds, overcharging [Defendant] and unit owners for work performed, charging for work not performed, and improperly removing over $100,000 from [Defendant's] bank accounts."[49] Instead, Plaintiff interprets Hamrick's trial testimony as blaming Defendant's attorney for coming up with the allegations against Plaintiff. [50] Plaintiff also interprets Mr. Hamrick's testimony as suggesting that Defendant fabricated allegations as a litigation strategy.[51] Plaintiff cites a large excerpt of Mr. Hamrick's trial testimony for all of Plaintiff's assertions.[52]

In its supplemental memorandum, Defendant renews its argument that there is no evidence that Defendant's counterclaim or affirmative defenses were asserted in bad faith.[53] Regarding the trial testimony of Hamrick, Defendant suggests that (a) Hamrick's testimony is the entire basis for Plaintiff's argument that Defendant acted in bad faith, and (b) the portions of Hamrick's testimony on which Plaintiff relied likely never would have been presented at trial but for a scheduling issue in response to which Defendant agreed to call Hamrick early.[54] The result was that Hamrick's testimony was presented before the Court granted Defendant's motion dismissing Plaintiff's claim for punitive damages. Defendant argues that it would not have called Hamrick to testify if it knew that the punitive damages claim would be dismissed. Thus, Defendant suggests that it is unfair for the Court to find bad faith on account of Hamrick's testimony, when Defendant only presented Hamrick early in an effort to be accommodating of scheduling.

---

[49] Plaintiff's Supplemental Briefing (July 7, 2014) at 6-7.
[50] Plaintiff's Supplemental Briefing (July 7, 2014) at 7.
[51] Plaintiff's Supplemental Briefing (July 7, 2014) at 7.
[52] Plaintiff's Supplemental Briefing (July 7, 2014), Exhibit G, "Excerpts from Trial Transcript" at 171-190.
[53] Defendant's Supplemental Briefing (July 7, 2014).
[54] Defendant's Supplemental Briefing (July 7, 2014) at 5.

Putting aside the issue of why Hamrick was called to testify, Defendant argues that Plaintiff has mischaracterized Hamrick's testimony and his role in the litigation.[55] Defendant says that Plaintiff "repeatedly tried to establish that Mr. Hamrick solely was responsible for the contents of the counter claim [*sic*] and affirmative defenses by characterizing Mr. Hamrick as being 'in charge' of the litigation."[56] Defendant says that "Plaintiff then uses the fact that Mr. Hamrick did not have firsthand knowledge supporting certain of those facts and allegations in the counter claim [*sic*] and affirmative defenses[ ] as evidence that there was no basis for those facts and allegations."[57] Contrary to what Plaintiff suggests, Defendant maintains that Hamrick's knowledge of the litigation was limited.[58] Instead, Defendant argues that in many cases Hamrick relied in good faith on the representations that had been made to him by other board members and residents.

However, even though Defendant argues that Hamrick relied greatly on what others told him about Plaintiff's alleged misconduct, Defendant disputes Plaintiff's characterization that Hamrick had no firsthand knowledge of misconduct. Defendant argues that Mr. Hamrick did testify that he had firsthand knowledge supporting some of the factual allegations in the counterclaim and affirmative defenses.[59] Defendant cites Hamrick's testimony concerning his knowledge of Plaintiff's alleged rigging of the bidding process,[60] Plaintiff's alleged overcharging

---

[55] Defendant's Supplemental Briefing (July 7, 2014) at 6.
[56] Defendant's Supplemental Briefing (July 7, 2014) at 6 (*citing* Exhibit B, Trial Transcript, Dec. 3, 2013 at 170-171).
[57] Defendant's Supplemental Briefing (July 7, 2014) at 6.
[58] Defendant's Supplemental Briefing (July 7, 2014) at 6.
[59] Defendant's Supplemental Briefing (July 7, 2014) at 7.
[60] Defendant's Supplemental Briefing (July 7, 2014) at 6 (*quoting* Exhibit B, Trial Transcript, Dec.3, 2013 at 185).

of Defendant,[61] and Plaintiff's failure to perform, or poor performance of, certain maintenance tasks.[62]

## C. Hamrick's Trial Testimony

While both parties' interpretations of Hamrick's trial testimony are based in fact, the Court finds that the parties have distorted Hamrick's somewhat ambiguous testimony to suit their purposes. Hamrick testified that he was the president of the Linden Green board from September 2011 to September 2013.[63] Mr. Hamrick also testified that Defendant had specially designated him to represent Defendant in the instant litigation.[64] When asked about the alleged misconduct of Plaintiff as asserted in Defendant's counterclaims, Mr. Hamrick alluded to general problems such as Plaintiff's alleged failure to make financial records accessible and transparent,[65] as well as deterioration of the physical buildings and grounds of the condominium complex, which Plaintiff was responsible for maintaining.[66] However, when asked to provide more specifics, Mr. Hamrick resorted to the position that many of his suspicions of mismanagement were based on what other persons had told him rather than personal knowledge. For example, when asked, "How about the financial records?," Mr. Hamrick replied, "Financial records, I understand that there was [*sic*] some problems with those."[67] But when asked the clarificatory question, "[what were the problems] To your knowledge, your personal knowledge?"; Hamrick replied, "My personal knowledge, I don't exactly know."[68]

---

[61] Defendant's Supplemental Briefing (July 7, 2014) at 6 (*quoting* Exhibit B, Trial Transcript, Dec.3, 2013 at 179).
[62] Defendant's Supplemental Briefing (July 7, 2014) at 6 (*quoting* Exhibit B, Trial Transcript, Dec. 3, 2013 at 153-154, 157).
[63] Trial Transcript, Dec. 3, 2013 at 150-151.
[64] Trial Transcript, Dec. 3, 2013 at 150.
[65] Trial Transcript, Dec. 3, 2013 at 151.
[66] Trial Transcript, Dec. 3, 2013 at 153.
[67] Trial Transcript, Dec. 3, 2013 at 169.
[68] Trial Transcript, Dec. 3, 2013 at 169.

Counsel for Plaintiff further asked Mr. Hamrick how he could, as representative for Defendant, accuse Plaintiff of specific misconduct, namely failure to collect dues and assessments, when he did not have personal knowledge of the financial records. Hamrick replied, "First of all, I didn't write this, okay. Second of all, the board members had expressed this in their meetings."[69] Hamrick testified that the allegation that Plaintiff had comingled funds was based on the treasurer's report to the condominium association board.[70]

When Plaintiff's counsel asked Hamrick whether it was fair to say that Defendant's allegation that Plaintiff misappropriated over $100,000 was "completely made up," Mr. Hamrick stated, "No, it's not made up."[71] Nonetheless, when asked to "identify one fact" in support of this allegation, Hamrick admitted that he could not do so.[72] Similarly, Hamrick admitted that the allegation that Plaintiff had committed fraud was probably "a poor thing to say," given that this allegation was based on Plaintiff's alleged failure to inform the residents that Plaintiff has signed another agreement with the board (which Hamrick acknowledged on reflection does not meet the definition of fraud).[73]

When asked why he would make allegations against Plaintiff without a stronger basis, Hamrick told the Court that "[the condominium association's] intention was not to do anything that would cause harm or malice to Kuratle Contracting. This was out of, I believe[,] we were being sued, we needed to come up with things that we felt were necessary to counter sue [*sic*] on

---

[69] Trial Transcript, Dec. 3, 2013 at 175.
[70] Trial Transcript, Dec. 3, 2013 at 177.
[71] Trial Transcript, Dec. 3, 2013 at 180-181.
[72] Trial Transcript, Dec. 3, 2013 at 181.
[73] Trial Transcript, Dec. 3, 2013 at 186.

and which we had gotten from information from other members of the condominium association complex as owners, simply, and board members, so that was put in as far as counterclaim."[74]

## IV. LEGAL STANDARD

### A. Costs of Litigation

The general rule in Delaware is that court costs are usually allowed to a prevailing party.[75] 10 *Del. C.* §5101 provides, "Generally a party for whom final judgment in any civil action [is awarded]… shall recover, against the adverse party, costs of suit, to be awarded by the court."

However, costs are not always awarded without exception.[76] The Delaware Supreme Court has recognized that "there may be circumstances under which costs do not go to the party to whom a final judgment is awarded. Determining when costs are awarded and when they are not is… a matter of judicial discretion under the statute."[77] The Court has found that the conclusion that awarding costs is ultimately discretionary is consistent with both 10 *Del. C.* §5101 and Superior Court Civil Rule 54(d).[78] Moreover, even when costs are awarded "as a matter of course," a court has discretion as to the amount of the award.[79] A significant factor for the court to consider is whether the costs could have reasonably been avoided.[80] Costs that are

---

[74] Trial Transcript, Dec. 3, 2013 at 181-182.
[75] *Casson v. Nationwide Insurance Co.*, 455 A.2d 717, 722 (Del. 1976).
[76] *Donovan v. Delaware Water & Air Resources Commission*, 358 A.2d 717, 722 (Del.1976).
[77] *Id.*
[78] *Id.*
[79] *Christiana Marine Service Corp. v. Texaco Fuel & Marine Marketing*, 2004 WL 42611, at *7 (Del. Super. Ct. Jan. 8, 2004).
[80] *Id.* at *8 (holding that the plaintiff was not entitled to *pro hac* admissions fees because plaintiff could have reasonably avoided these fees by selecting a qualified Delaware attorney).

not necessary but are incurred for the convenience of the claimant are not compensable under 10 *Del. C.* §5101.[81]

Costs beyond those recoverable under 10 *Del. C.* §5101 and Superior Court Civil Rule 54(d) may be recoverable when authorized by a contractual provision[82] or when the Court finds that the opposing party acted in bad faith.[83]

## B. Attorney's Fees

Unlike costs, attorney's fees are usually not recoverable by the prevailing party. One exception to this rule is when a statutory or contractual provision authorizes fee-shifting.[84] However, even when fee-shifting is authorized under a contractual provision, the court may still elect to award fees only in proportion to a party's limited success.[85] The United States Supreme Court has held that attorney's fees should not be awarded for work related to claims distinct from the claim on which the party was successful.[86]

A second exception, recognized by both the Delaware Supreme Court and the United States Supreme Court, is for cases of bad faith. "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records[,] or knowingly asserted frivolous claims."[87]

---

[81] *See, e.g., Ciappa Const., Inc. v. Innovative Property Resources, LLC*, 2007 WL 1705632, at *2 (Del. Super. Ct. June 12, 2007) (finding photocopying costs to be convenience expenses that are not compensable).
[82] *Salaman v. National Media Corp.*, 1994 WL 465535, at *2 (Del. Super. Ct. July 22, 1994).
[83] There is case law that suggests, but does not explicitly hold, that bad faith may be the basis for recovery of cost beyond what is authorized by 10 *Del. C.* §5101. *See, e.g.*, *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014); *E.I. DuPont de Nemours & Co. v. Medtronic Vascular, Inc.*, 2013 WL 1792824, at *2 (Del. Super. Ct. Apr. 24, 2013).
[84] *Casson,* 455 A.2d at 370.
[85] *Fasciana v. Electronic Data Systems Corp.*, 829 A.2d 178, 185 (Del. Ch. 2003) (*citing Hensley v. Eckerhart*, 461 U.S. 424 (1983)).
[86] *Hensley*, 461 U.S. at 440.
[87] *Johnson v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

## V. DISCUSSION

### A. Plaintiff's Requested Compensation

Plaintiff has asked for counsel fees in the amount of $135,546.05 and costs of $30,420.94, which Plaintiff maintains it incurred in pursuit of the main claim. In the alternative, Plaintiff asks for fees and costs associated only with opposing Defendant's counterclaim and affirmative defenses, which Plaintiff says are 35% of the total amount (counsel fees of $47,441.12 and costs of $10,647.33).[88] Plaintiff argues that these costs and fees are recoverable under the contractual fee-shifting provision and/or the bad faith exception to the general rule that attorney's fees are not recoverable.[89]

If the Court does not adopt either of these fee-shifting theories, Plaintiff argues that certain of its costs are still recoverable under 10 *Del. C.* §5101 and Superior Court Civil Rule 54. Concerning this subset of its costs, Plaintiff has provided an itemized list by category of costs as follows: LexisNexis filing fees ($1,372.50), Westlaw Research ($1,850.24), Parking ($58.50), Courier Services ($195.00), Photocopying ($200.92), Service Fees ($30.00), and Mediator's Fee ($2,330.50); for a total of $6,037 in costs.[90] Plaintiff also argues that a portion of its expert witness fee for trial testimony ($1,320.00) should be included as a cost recoverable under 10 *Del. C.* §5101 and Superior Court Civil Rule 54.[91]

### B. Costs

*i. Costs under 10 Del. C. §5101*

---

[88] Plaintiff's Motion for Costs and Fees at 7.
[89] Plaintiff's Motion for Costs and Fees at 7.
[90] Plaintiff's Motion for Costs and Fees at 8.
[91] Plaintiff's Motion for Costs and Fees at 8-9.

It is undisputed that Plaintiff is the prevailing party. As such, Plaintiff is entitled to costs under 10 *Del. C.* §5101 and Superior Court Civil Rule 54. The Court begins by considering the itemized list of costs that Plaintiff claims under 10 *Del. C.* §5101.

Filing and service costs are well-recognized as compensable.[92] Hence, the Court awards all of the LexisNexis filing fees ($1,372.50) and Service Fees ($30.00). Fees for expert testimony at trial are similarly well-established as compensable, so long as they are reasonable, which is a determination to be made by the Court.[93] There is no "fixed formula" for determining what a reasonable expert fee should be.[94] As expert testimony most frequently arises in the medical context, most of the Delaware cases specifically concern medical experts. To determine the reasonableness of medical experts' fees, Delaware courts have relied on industry-specific studies of the Delaware Medico-Legal Affairs Committee.[95] However, there is no corresponding index for CPAs. In determining whether an expert fee is reasonable, courts in other jurisdictions have considered factors including the background of the expert, the rates charged by other experts in the same field and region, the time and effort involved in testifying, and the complexity of the matter.[96] In 2007, a Delaware court awarded $1,200 for the trial testimony of a CPA.[97] Plaintiff has presented evidence that expert David J. Ford charged 4.4 hours for a total of $1,320 for his trial testimony.[98] The Court finds that this fee is reasonable and awards Plaintiff $1,320.00 for the expert testimony of David J. Ford, CPA.

---

[92] *See, e.g., Christiana Marine Service Corp.*, 2004 WL 42611, at *7.
[93] *Payne v. Home Depot*, 2009 WL 659073, at *7 (Del. Super. Ct. Mar. 12, 2009).
[94] *McLaughlin v. Dover Downs, Inc.*, 2008 WL 795311, at *2 (Del. Super. Ct. Mar. 26, 2008).
[95] *Dunkle v. Prettyman*, 2002 WL 83337 , at *3 (Del. Super. Ct. May 1, 2002).
[96] *Axelson v. Hartford Ins. Co. of the Midwest*, 2013 WL 1261757, at *2 (D. Nev. Mar. 26, 2013).
[97] *Foley v. Elkton Plaza Associates, LLC.*, 2007 WL 959521 (Del. Super. Ct. Mar. 30, 2007).
[98] Plaintiff's Motion for Costs and Fees, Exhibit C, "Email from David Ford".

18

Costs for legal research are not an itemized, necessary cost under 10 *Del. C.* §5101.[99] Hence, Plaintiff's claim for reimbursement for Westlaw Research ($1,850.24) is not compensable under 10 *Del. C.* §5101. Similarly, photocopying costs are not recoverable unless they are specifically for exhibits used at trial. "Photocopies made by plaintiff for use of himself and his attorney… are not allowable costs because they are for the use of the party and not for the Court."[100] Hence, Plaintiff's claim for Photocopying ($200.92) is also not reimbursable under 10 *Del. C.* §5101. Courier services have also been found not compensable.[101] Hence, the Court also finds the courier services claimed by Plaintiff ($195.00) not compensable under 10 *Del. C.* §5101.

Courts have found traveling, lodging, and parking fees compensable when they are incurred by an expert witness in relation to his or her testimony at trial.[102] However, courts have declined to include parking costs incurred by the parties or by counsel.[103] As Plaintiff has not specified that the cited parking costs were incurred by an expert witness testifying at trial, the Court finds the Parking expenses ($58.50) not compensable under 10 *Del. C.* §5101.

Mediator's fees have traditionally been split between the parties, and there has been at least one decision in this Court that saw no reason to disturb this longstanding practice.[104] The Court finds the reasoning sound, and finds that Plaintiff should be responsible for their share of the mediator's fee. It is presumed that the amount sought, $2,330.50, is the Plaintiff's share of the mediator's fee.

---

[99] *Ripsom v. Beaver Blacktop, Inc.*, 1989 WL 147336, at *2 (Del. Super. Ct. Dec. 4, 1989).
[100] *Id.* at *1 (*quoting Ota v. Health-Chem. Corp.*, 1987 WL 12440, at *1 (Del. Super. Ct. May 18, 1987).
[101] *Ciappa Const., Inc.*, 2007 WL 1705632, at *2.
[102] *Payne,* 2009 WL 659073, at *8; *Crook v. Ford Motor Co.*, 2001 WL 1738869, at *1 (Del. Super. Ct. Nov. 1, 2001).
[103] *Ciappa Const., Inc.*, 2007 WL 1705632 at *2.
[104] *See, e.g., Reinke v. Furbush*, 2011 WL 7063367, at *2 (Del. Super. Ct. Dec. 1, 2011).

The Court **GRANTS** Plaintiff's Motion for Costs in the amount of $1,372.50 plus $30.00, for a total of $1402.50, in filing and service fees and $1,320.00 for the expert testimony of David J. Ford, CPA.

### ii. Is there a valid fee-shifting provision?

Plaintiff argues that Plaintiff is entitled to all costs, beyond those traditionally compensable under 10 *Del. C.* §5101, because of a contractual fee-shifting provision. In *Salaman v. National Media Corp.*, the court found claimant entitled to a number of billable costs not recoverable under 10 *Del. C.* §5101 (e.g., photocopying, travel, and research costs) because there was a valid, unambiguous contract which required the opposing party to "pay all costs and expenses (including attorneys' fees and disbursements)".[105]

The provision relied upon by Plaintiff is found in one of the documents that follows the main body of the 2010 Agreement. This document is entitled, "Landscaping and Maintenance Proposal." This document appears distinct from the main text of the contract, and, unlike the main contract, is not signed by the parties. Mrs. Kuratle's trial testimony suggests that part of the initial dispute between the parties over the validity of the 2010 Agreement may have concerned whether these additional documents were in fact part of the contract.[106] Nonetheless, Plaintiff includes this document as part of the 2010 Agreement in its trial exhibit,[107] Defendant includes the 2002 and 2007 analogs of this document as part of the 2002 and 2007 Agreements

---

[105] *Salaman,* 1994 WL 465535, at *2.
[106] Trial Transcript, Dec. 2, 2013 at 49.
[107] Plaintiff's Trial Exhibit 1, Tab 1.

in its trial exhibits,[108] and Defendant refers to this document in the 2010 Agreement as "the 'Landscaping and Maintenance Proposal' section of the contract."[109]

The provision within the "Landscaping and Maintenance Proposal" that Plaintiff cites reads as follows:

> Delinquent accounts may be referred to a collection agency and or attorney. Client agrees to payment of invoice amount, services charges, and any related legal expenses of balance on contract.[110]

While Plaintiff concedes that this provision is "not artfully drafted," Plaintiff maintains that "the phrase 'any related legal expenses of balance on contract' clearly indicates the parties' intention that if Plaintiff incurs counsel fees and costs in connection with a legal proceeding to enforce its rights under the 2010 Agreement, [Defendant] will be responsible to pay those counsel fees and costs."[111] In response, Defendant argues that, when read in context, this provision "does not in any way articulate an intent by the parties to shift attorneys' fees incurred in the course of litigation between the parties. It simply governs the use of a collection agency or an attorney to collect delinquent invoices for certain additional lawn care services."[112]

The parties appear to be in agreement that the document containing the alleged fee-shifting provision was in fact part of the 2010 Agreement. Defendant appears to concede that this fee-shifting provision is applicable to the collection of monies owed for landscaping and maintenance services.[113] It would be a mistake, however, to extend this narrow fee-shifting provision beyond its intended narrow scope. The Court finds that while there is a valid fee-

---

[108] Defendant's Trial Exhibit 1, 2.
[109] Defendant's Response in Opposition (Jan. 2, 2014) at 2.
[110] Complaint, Ex. C, "2010 Agreement".
[111] Plaintiff's Motion for Costs and Fees at 4.
[112] Defendant's Response in Opposition (Jan. 2, 2014) at 2.
[113] Defendant's Response in Opposition (Jan. 2, 2014) at 2.

shifting provision, it applies only to costs and fees specifically incurred in the collection of unpaid landscaping and maintenance invoices. The plain language of the provision indicates that it applies to "delinquent accounts," and authorizes fee-shifting for legal expenses incurred in the collection of these accounts. Second, the provision does not appear in the main body of the agreement (the document to which the signatures of the parties are affixed).

Among the damages asserted by Plaintiff in the Complaint were unpaid maintenance invoices.[114] However, evidence of these delinquent invoices was never presented to the Court. Further, the trial testimony of Mrs. Kuratle focused on lost income after Defendant breached the 2010 Agreement. The jury awarded $165,000 in lost profits but did not make an award for unpaid invoices. Given the very minor role the unpaid invoices claim played in the litigation and the fact that it was not reflected in the jury award, the Court finds that Plaintiff is not entitled to additional costs in the instant action, beyond what those permitted under 10 *Del. C.* §5101, under the fee-shifting provision.

### iii. Is Plaintiff entitled to additional costs due to bad faith?

Plaintiff suggests that, in the alternative, Plaintiff is entitled to costs beyond what is authorized under 10 *Del. C.* §5101 for costs incurred in litigating Defendant's affirmative defenses and counterclaim, which Plaintiff alleges were brought in bad faith. It is well established that bad faith may serve as the basis for awarding attorney's fees.[115] There is also case law that suggests, but does not explicitly hold, that bad faith may also serve as the basis for awarding costs beyond those compensable under 10 *Del. C.* §5101.[116] However, costs and fees

---

[114] Complaint at 6.

[115] *In re Grupo Dos Chiles, LLC*, 2006 WL 2507044, at *1 (Del. Ch. Aug. 17, 2006).

[116] *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014); *E.I. DuPont de Nemours & Co. v. Medtronic Vascular, Inc.*, 2013 WL 1792824, at *2 (Del. Super. Ct. Apr. 24, 2013).

22

are awarded for bad faith only in "extraordinary cases," where the claimant can demonstrate by "clear evidence" that the party against whom fees are sought acted in bad faith.[117] Where there is "a 'colorable basis' for a claim, the award of attorneys' fees and costs is unwarranted."[118]

In *Fairthorne Maintenance Corp. v. Ramunno*, the Court of Chancery found sufficient evidence of bad faith conduct to impose fee-shifting.[119] The defendants were homeowners who refused to remove personal property, including a children's outdoor playset from a common area belonging to their neighborhood homeowner's association. The court found that the arguments advanced by the defendants "involve[d] tangential issues and [were] designed solely to help [the defendants] delay the legal consequences of their undisputed [tortuous] conduct."[120] Among other things, the court found that the defendants had asserted frivolous age discrimination claims on behalf of defendants' minor children "without consideration of *any* of the applicable statutes or case law precedent" (emphasis in original) in an effort to make good on their threat to "make this a federal case."[121] At oral argument, defense counsel conceded that the age discrimination for minor children claims were without a basis in law.[122]

The *Fairthorne* defendants also argued that plaintiff could not prosecute them for trespass while allowing others to similarly trespass.[123] The court found this claim to be without basis in fact as well as without basis in law. Concerning the legal basis for the claim, the defendants failed to cite "a single case from any jurisdiction—much less from Delaware—standing for the

---

[117] *Lawson*, 91 A.3d at 552.
[118] *E.I. DuPont de Nemours & Co.*, 2013 WL 1792824, at *2.
[119] *Fairthorne Maintenance Corp. v. Ramunno*, 2007 WL 2214318 (Del. Ch. July 20, 2007).
[120] *Id*. at *1
[121] *Id.* at *11.
[122] *Id.*
[123] *Id.* at *6.

23

proposition that a landowner may not allow some trespasses while preventing others."[124] Concerning the factual basis for the claim, defendants did not provide "a single concrete detail… that would identify by name, address, or otherwise these supposed infringements."[125]

On the other hand, Delaware courts have declined to engage in fee shifting when the evidence of bad faith was less than clear. For example, in *Estate of Carpenter v. Dinneen*, the estate sued decedent's former financial advisors for breach of fiduciary duty and other misconduct in the handling of decedent's monies.[126] The defendants counterclaimed for pension-like gifts that they had allegedly been promised by the decedent. The court found that the defendants' counterclaims, while ultimately rejected by the court, were not frivolous to the point of constituting bad faith. The defendants cited two principal cases in support of their legal arguments.[127] The court found both of these cited cases to be relevant to the defendants' counterclaims. The court observed that, "[a]lthough both cases are distinguishable, they illustrate the fact intensive nature of [defendants'] counterclaims."[128] In addition to providing a legal basis for their claims, the *Dinneen* defendants also "presented evidence of several facts that provided at least some support for their contention [that the decedent] would have wanted them to receive [the gifts under the circumstances]."[129] Moreover, the court noted that it could not use the fact that defendants ultimately withdrew the counterclaim as evidence of its frivolousness because doing so would "discourage future parties from withdrawing claims when advisable[ ] and waste judicial resources."[130]

---

[124] *Id.*
[125] *Id.*
[126] *Estate of Carpenter v. Dinneen*, 2008 Del. Ch. LEXIS 40 (Del. Ch. Mar. 26, 2008).
[127] *Id*. at *106-109.
[128] *Id.* at *106.
[129] Id. at *109.
[130] *Id.* at *77-78, n.198.

In the instant case, unlike in *Fairthorne* and like in *Dinneen*, Defendant have provided legal arguments in support of the counterclaim causes of action, alleged supporting facts, and provided at least some evidence in support of these allegations. Defendant did commission and eventually provide a twenty-four page report (the Horty Report), prepared by the Certified Public Accounting Firm of Horty & Horty, P.A., which "noted accounting and bookkeeping errors and noted material financial reporting statements," as well as missing records.[131]

Plaintiff points to the fact that Mr. Hamrick testified, "I can't identify one fact," in response to the request that he identify one fact in support of Defendant's contention that "upon information and belief that [Plaintiff] took a hundred thousand dollars."[132] However, the Court recognizes that Hamrick is not Defendant, and Hamrick's lack of knowledge of certain facts should not necessarily be imputed to Defendant.[133] The Horty Report alone provides adequate basis to support Defendant's contention that it has a colorable basis for its counterclaims.

Further, the trial testimony of Mr. Hamrick, while inconclusive, suggests that Defendant had at least some reasonable basis for alleging misconduct on the part of Plaintiff. Hamrick did testify that, "[the Condominium Association's] intention was not to do anything that would cause harm or malice to Kuratle Contracting. This was out of, I believe[,] we were being sued, we needed to come up with things that we felt were necessary to counter sue on and which we had

---

[131] Defendant's Response in Opposition (Jan. 2, 2014), Exhibit B at 2 of 24. While the Court did grant Plaintiff's Motion to Exclude the testimony of the author of the report on the grounds that the report did not adequately specify the methodology used, this fact is immaterial to the present inquiry. Order (Nov. 15, 2013). To find defendant's counterclaims non-frivolous, the Court needs only to find them "colorable." *E.I. DuPont de Nemours & Co.*, 2013 WL 1792824, at *2. As the court in *Dinneen* affirmed once again, the fact that a claim is not successful cannot be evidence that it was frivolous.

[132] Trial Transcript, Dec. 3, 2013 at 181.

[133] While knowledge is imputed to a business organization when a director or officer of the organization acquires the knowledge, the converse does not hold (i.e., it is not true that the lack of knowledge on the part of one director or officer is generalized to the organization). If the latter were true, then all of the directors and officers would have to know a fact in order for the organization to know the fact, and this is clearly not what Delaware case law holds. *See, e.g., Chaplake Holdings, Ltd. v. Chrysler Corp.*, 2002 WL 148088, *32 (Del. Super. Ct. Jan. 10, 2002) (reversed in part on other grounds).

25

gotten from information from other members of the condominium association complex as owners, simply, and board members, so that was put in as far as counterclaim."[134]  This is the testimony that Plaintiff contends evidences Defendant's bad faith.  However, when Hamrick's testimony is examined in context, the evidence is inconclusive.  Hamrick made this statement in response to the following question from Plaintiff's counsel: "You said earlier that you had no malice or didn't want to hurt anybody, that you just wanted to get along with Kuratle, but yet at the same time, sir, you make all these wild accusations against them.  Please explain how you can make these accusations and have no malice at all or not try to hurt Kuratle, what was your intention if it wasn't to hurt them to say these things?"[135]  Further, Hamrick unequivocally testified that Defendant believed that there was evidence of misconduct by Plaintiff; Hamrick said, "we didn't make things up. The profit and loss statements actually showed, if you looked at them closely in the last four years of Kuratle Contracting, they ballooned out of proportion."[136] In this context, a reasonable person could conclude that Hamrick did have a good faith belief that Plaintiff had engaged in misconduct but would not have asserted these claims (due to a desire to "get along with Kuratle") if Plaintiff had not first filed suit against Defendant.

For these reasons, the Court finds that there is no clear evidence that Defendant's counterclaims were vexatious or asserted in bad faith.  Keeping in mind that the party seeking a fee award under a bad faith theory bears the "stringent evidentiary burden of producing clear evidence of bad faith conduct," the Court will not award additional costs or attorney's fees on

---

[134] Trial Transcript, Dec. 3, 2013 at 182.
[135] Trial Transcript, Dec. 3, 2013 at 181.
[136] Trial Transcript, Dec. 3, 2013 at 182.

26

this ground.[137]  Plaintiff's Motion for Costs beyond that which the Court has found allowable under 10 *Del. C.* §5101 is hereby **DENIED**.

### C. Attorney's Fees

As explained above, attorney's fees are not awarded to a prevailing party absent a valid contractual fee-shifting provision or demonstrable bad faith by the opposing party.  The Court has found no demonstrable bad faith by Defendants.  While the Court has found a valid fee-shifting provision, the Court finds that the claims to which the provision applies (namely, claims for unpaid maintenance and landscaping invoices) constitute such a minor part of the litigation as not to warrant an award of attorney's fees.  Although Plaintiff raised this issue in the Complaint, the issue of unpaid invoices played no real part in the litigation of this case.  For this reason, the Court cannot find that any significant portion of Plaintiff's attorney's fees can be separated out as attributable to the litigation of the unpaid invoices claim.  The Court hereby **DENIES** Plaintiff's Motion for Attorney's Fees.

### VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part Plaintiff's Motion for Costs under 10 *Del. C.* §5101 and finds Plaintiff entitled to Lexis filing fees in the amount of $1,372.50, service fees in the amount of $30 and the expert's fee in the amount of $1,320.    Plaintiff's Motion for Attorney's Fees is **DENIED**.

**IT IS SO ORDERED.**

_____/s/_____
**M. JANE BRADY**
 Superior Court Judge

---

[137] *Estate of Carpenter*, 2008 Del. Ch. LEXIS 40 at *76.

27